IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**FILED - GR**

October 13, 2023 9:16 AM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:JMW  SCANNED BY: KB /10/13

| | | |
|---|---|---|
| RYAN MILLIRON | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case No. 1:23-cv-30 |
| | § | |
| U.S. DEPARTMENT OF DEFENSE, | § | Hon. Jane M. Beckering |
| CENTRAL INTELLIGENCE | § | U.S. District Judge |
| AGENCY, | § | |
| FEDERAL BUREAU OF | § | Hon. Sally J. Berens |
| INVESTIGATION, | § | U.S. Magistrate Judge |
| OFFICE OF THE DIRECTOR OF | § | |
| NATIONAL INTELLIGENCE | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

## MOTION FOR DISCOVERY

Plaintiff Ryan Milliron, Pro Se, hereby moves the Court for an order compelling Defendants to produce documents and witnesses relating to several of his FOIA requests.  Plaintiff believes that these documents and witnesses are relevant to the issues in this case, including improper withholding of documents and the motivations for doing so, and the necessary identification of responsive records. Plaintiff has consulted with counsel for the government and Defendants oppose Plaintiff's request for discovery.

## ANALYSIS

1. Discovery is rare in FOIA cases. See *Thomas v. Food & Drum Admin.*, 587 F. Supp. 2d 114, 115 (D.D.C. 2008).

2. Plaintiff acknowledges the presumption of good faith that the government typically enjoys, and the unique nature of litigation under the Freedom of Information Act. Still, Discovery shall be permitted in instances where "...a plaintiff raises a sufficient question

as to the agency's good faith in processing documents in response to a FOIA request." *See, e.g. Citizens for Responsibility & Ethics in Washington v. Dep't of Justice*, 05-cv-2078, 2006 WL 1518964 (D.D.C. June 1, 2006) (Sullivan, J.) (permitting discovery in a FOIA action where the government engaged in extreme delay).

3. This is such a case. Plaintiff notes over nine months have passed since the lawsuit was filed, with additional time accrued since the dates of the relevant FOIA requests.

4. Discovery is also appropriate in cases where the responsive documents are likely to cause exceptional embarrassment to the government, or agents thereof; and where there is a credible accusation of misconduct against the government such that the presumption of good faith must be pierced to provide transparency and assurance over the completeness of production of records. This FOIA case will be unique in this regard.

5. The limiting factor in discovery in a FOIA case is often the inability for the Plaintiff to articulate bad faith. Often, Plaintiffs are disadvantaged against the government and while they may have a sense of wrongdoing, they cannot preemptively present evidence of the wrongdoing, which they are often seeking discovery to obtain. This is why discovery in FOIA cases is often limited to the search itself and the processing of documents responsive to the request.

6. FOIA has been articulated to be a means through which to hold government officials accountable and to uncover corruption. FOIA was designed by Congress to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Judicial Watch, Inc. v. Dept. of State*, D.D.C. No. 1:13-cv-01363-EGS quoting Morley v. C.I.A., 508 F.3d 1108, 1114 (D.C. Cir. 2007) (internal citations omitted).

7. Disclosure rather than secrecy is the "dominant objective of the Act" J*udicial Watch, Inc. v. Dept. of State*, D.D.C. No. 1:13-cv-01363-EGS quoting McKneely v. United States Dept. of Justice, 2015 WL 5675515 at *2 (D.D.C. 2015).

8. The situation around each of Plaintiff's FOIA requests noted herein and the responsive records is complex. Each request that Plaintiff is moving for discovery on is related to the hack of the Democratic National Committee during 2016 and the attribution of that alleged hack to Russia.

9. Discovery in this instance is needed to take depositions of knowledgeable persons of the underlying records. It is the only way to ensure completeness of production given the

inconsistencies and contradictions present in the public record, and the improper motivations present in denying access to responsive records.

10. Deposing persons knowledgeable about the underlying events of responsive documents is not unprecedented. In *Potomac Navigation v. U.S. Maritime Admin. Potomac NAV*, Civil Action No. WMN-09-217, Civil Action No. WMN-09-218 (D. Md. Dec. 15, 2009), the court granted discovery and allowed depositions of knowledgeable persons both at the Maritime Administration Agency and the Environmental Protection Agency when the Plaintiff sufficiently argued that documents were likely to exist that hadn't been produced.

11. Depositions of knowledgeable persons were also granted in *Judicial Watch, Inc. v. Department of State*, 1:13-cv-01363, (D.D.C. May 04, 2016) ECF No. 73, noting that "questions surrounding the creation, purpose and use of the clintonemail.com server must be explored through limited discovery before the Court can decide, as a matter of law, whether the Government has conducted an adequate search in response to Judicial Watch's FOIA request." In order words, the underlying circumstances were relevant to the processing of documents under FOIA.

12. Plaintiff does not wish to overburden the court with an overly-lengthy brief, or to frivolously belabor the underlying misconduct he is seeking records regarding; however, it is only in the proper context that the need for this discovery can be understood.

13. Plaintiff has been active as an independent journalist submitting Freedom of Information Act requests, Open Records Requests, and developing sources of information both inside and outside of government for multiple years. Most recently, he co-authored an article with Matt Taibbi which directly relates to several of his FOIA requests here, detailing an apparent role for researchers associated with Hillary Clinton's 2016 election campaign in attributing the hack of the Democratic National Committee to Russia.[1]

## FOIA's AT ISSUE

14. Plaintiff seeks discovery relating to the following FOIA's.

15. DOD 22-F-0854

---

[1] See https://www.racket.news/p/forget-collusion-was-interference?r=5mz1.

    a. **Request**: "...any memorandums of understanding, contracts, emails, or agreements in DARPA's possession concerning the use of DARPA's resources in the aid of criminal investigations by the FBI or prosecutions by the Department of Justice."

    b. **Status**: No documents have been produced. Government represents that this is waiting on third-party consultations.

    c. **Purpose**: Plaintiff's request is primarily intended to elucidate the role of DARPA and the use of DARPA resources in aid of the DNC hack investigation and attribution to Russia. DARPA served as liaison between cyber researchers connected to Hillary Clinton and the Department of Justice, Special Counsel Robert Mueller and the Federal Bureau of Investigation.

16. DOD 23-F-0055

    a. **Request**: "...all emails in the account of Angelos Keromytis (DARPA) sent to or from emails ending with @usdoj.gov or @fbi.gov suffixes."

    b. **Status**: On October 10th, 2023, the government produced an interim release of 113 highly redacted pages that appear to primarily relate to meeting invitations between Keromytis and FBI officials, but no substantive emails relating to the DNC hack or attribution have been produced.

    c. **Purpose**: Angelos Keromytis is one of 2 known DARPA officials who had knowledge of the cyber researchers' work on the DNC hack attribution, he reviewed their attribution report and likely has knowledge of the information flowing to other agencies.

17. FBI 1558747-000

    a. **Request**: "...any reports, emails, memorandums, or letters in the FBI's possession relating to the hack of the DNC or Guccifer 2.0 that were provided by David Dagon or Manos Antonakakis."

    b. **Status**: On October 3, 2023 the government provided a final response neither confirming nor denying the existence of responsive records and citing personal privacy exemptions.

    c. **Purpose**: Dagon and Antonakakis are cyber researchers connected to allegations alleging a secret communications channel existed between Donald Trump and

Vladimir Putin, and were working for the benefit of Hillary Clinton during 2016. This request is intended to obtain evidence further exposing the reliance the US government placed on politically-connected cyber researchers.

18. ODNI DF-2022-00400

    a. **Request**: "...any files in DNI's possession relating to attribution work done on the hack of the Democratic National Committee by the Russians in 2016 that originated with or was influenced by, Rodney Joffe, David Dagon, Manos Antonakakis, Angelos Keromytis, or Tejas Patel."

    b. **Status**: On September 8, 2022, ODNI provided a final response, and indicated they could neither confirm nor deny the existence of responsive records citing Section 3.6(a) of Executive Order 13526 and citing exemptions b(1) and b(3). The government has declined to address the timely filed appeal Plaintiff submitted prior to commencing litigation.

    c. **Purpose**: This request focuses on cyber researchers connected to Hillary Clinton and the Alfa Bank allegations and the information on the DNC hack that they provided to the US government, including via DARPA personnel Angelos Keromytis and Tejas Patel.

19. ODNI DF-2022-00401

    a. **Request**: "...any reports, emails, assessments or notes used to support the October 7, 2016 attribution statement noted here:

    https://www.dhs.gov/news/2016/10/07/joint-statement-department-homeland-security-and-office-director-national."

    b. **Status**: No documents have been produced. Government represents this is waiting on third party consultations. Plaintiff notes he has knowledge one of these consultations is at the Department of Defense, where it appears in the FOIA request portal associated with his account.

    c. **Purpose**: The attribution analysis of Manos Antonakakis and David Dagon was dated August 7, 2016. This request focuses on whether the government relied on their work or any associated Hillary Clinton-connected cyber researchers for official attribution in naming Russia responsible for the hack of the DNC in early October 2016.

## BACKGROUND

### ALFA BANK

20. Broadly speaking, Plaintiff's requests concern responsive records relating to three cyber researchers known to have been associated with the Hillary Clinton 2016 Presidential campaign in Rodney Joffe, Manos Antonakakis, and David Dagon.

21. Additional portions of FOIAs relate to employees of the Defense Advanced Research Projects Agency (DARPA), a research agency inside the Department of Defense. DARPA personnel, including Angelos Keromytis and Tejas Patel, who were conduits of information flowing to and from the Clinton-connected cyber researchers, and the FBI, Department of Justice, and Special Counsel Robert Mueller.

22. Plaintiff notes that shortly after Special Counsel John Durham indicted Michael Sussmann (an attorney working for Hillary Clinton during 2016)[2], public reporting identified Rodney Joffe as Tech-Executive-1, Manos Antonakakis as Researcher-1, and David Dagon as Researcher-2 as referenced in the indictment [hereafter referenced as the "cyber researchers"].[3]

23. That indictment, and ensuing court filings detailed deeply flawed analysis done by these cyber researchers which they performed on incomplete data [missing the "A" records] that alleged a secret communications channel existed between Vladimir Putin and Donald Trump using Alfa Bank and Spectrum Health as intermediaries, referenced hereafter as the "Alfa Bank allegations." Their work was delivered to the FBI anonymously by Michael Sussmann during September 2016.

24. Analysis by one independent blogger noted that the data logs purporting to support the Alfa Bank allegations contained numerous technical errors that were suggestive of manual tampering, or in his words, fraud.[4]

25. At the trial of Michael Sussmann, FBI agent Scott Hellman testified that he and his supervisor rejected the Alfa Bank allegations after only a day of analysis. Conclusions from the FBI were that the methodology of the researchers was "questionable" and the

---

[2] See https://www.justice.gov/sco/press-release/file/1433511/download. Accessed October 12, 2023.
[3] See
https://thefederalist.com/2022/03/09/exclusive-researcher-behind-trump-alfa-bank-story-tried-to-furiously-fight-off-special-counsel-investigation/. Accessed October 12, 2023.
[4] See https://weaponizedautism.wordpress.com/2017/04/09/trump-dns-logs-fabricated/. Accessed October 4, 2023.

allegations were "suspicious".[5] Investigative efforts by the FBI had included obtaining
data logs from the host of the Trump server, and ultimately no corroboration of the data
used for the allegations was found, adding to the questions over the legitimacy of the data
itself.

26. Hellman went on to explain that, "I thought that the person who had drafted this
document may have been suffering from some mental disability." *Id.*

27. The Alfa Bank allegations and related research was at least partially funded by a contract
given to Georgia Institute of Technology ("Georgia Tech") by DARPA.

28. Manos Antonakakis and David Dagon are employed as researchers by Georgia Tech,
where they utilized these funds from DARPA to purchase consumer data from Neustar, a
company where Rodney Joffe was employed as a senior executive.

29. Rodney Joffe, Manos Antonakakis, and David Dagon maintain extensive contacts
throughout the federal government, including at the NSA, FBI, Department of Homeland
Security, Department of Defense, Cyber Command, and Congress. Each has also
obtained numerous multi-million dollar contracts with the US government through
various corporate entities generally relating to cyber intelligence.

30. Joffe was also engaged as a Confidential Human Source for the FBI where he provided
information on Russian cyber crimes.[6]

31. The indictment filed by Special Counsel John Durham against Michael Sussmann takes
note of some disturbing exchanges where Joffe tasked Antonakakis and Dagon to find
materials to "...support an "inference" and "narrative" regarding Trump that would please
certain "VIPs"[7]...", later identified as the Hillary Clinton campaign.

32. Plaintiff also asks the court to take note of a relationship between the cyber researchers
and Fusion GPS[8], an opposition research firm hired by Perkins Coie during 2016, who in
turn contracted Christopher Steele, a former foreign intelligence officer, to compile what
is colloquially referred to as the Steele dossier.

---

[5] See
https://www.washingtonexaminer.com/news/justice/fbi-agent-at-sussmann-trial-bureau-rejected-alfa-bank-claims-within-days. Accessed October 12, 2023.
[6] See https://www.documentcloud.org/documents/22052283-sussmann-trial-525-morning. PDF 111-113. Accessed
October 12, 2023.
[7] See https://www.justice.gov/sco/press-release/file/1433511/download. Accessed October 12, 2023.
[8] See https://www.documentcloud.org/documents/22046346-0603 . Email from Laura Seago to Rodney Joffe.
Accessed October 12, 2023.

33. These researchers, in coordination with Fusion GPS and Christopher Steele, engaged in a practice of circular reporting in which the Alfa Bank allegations were provided to the FBI through multiple channels purporting to be independent of each other, and multiple government agencies including the State department, as well as through the media.

34. As part of this effort, "...Michael Sussmann directed David Dagon to speak with the press and (...) in doing so, he was working for Hillary Clinton."[9]

35. After the FBI closed its investigation into the Alfa Bank claims, new data purporting to support the claims was created or found; and provided to the CIA by Rodney Joffe.

36. The Alfa Bank allegations have been derided as not "technically plausible" by the CIA.[10]

37. For brevity, Plaintiff only wishes to make note of a one additional email suggestive of the researchers intentions in the Alfa Bank allegations, where Joffe seeks to gain assurance only that their claims could be considered "plausible" before passing them to the FBI:



(Obtained from https://www.documentcloud.org/documents/22046328-0132. Sussmann trial exhibit 132. Accessed October 12, 2023.)

---

[9] See https://www.documentcloud.org/documents/22052280-sussmann-trial-523-afternoon. Allison Sands Testimony. Pg 144. Accessed October 12, 2023.

[10] See https://www.washingtonexaminer.com/news/justice/fbi-agent-at-sussmann-trial-bureau-rejected-alfa-bank-claims-within-days. Accessed October 12, 2023.

## DNC Hack

38. Documents obtained through Open Records Requests by the Plaintiff indicated that the Clinton-connected cyber researchers were also associated with the investigation into the hack of the Democratic National Committee and the subsequent attribution for the hack.

39. In one email sent from Manos Antonakakis to colleagues at Georgia Tech he noted:

> Finally, I will leave you with an anecdote and a thought. During one of my interviews with the Special Counsel prosecutor, I was asked point blank by Mr. DeFilippis, "Do you believe that DARPA should be instructing you to investigate the origins of a hacker (Guccifer_2.0) that hacked a political entity (DNC)?" Let that sync for a moment, folks. Someone hacked a political party (DNC, in this case), in the middle of an election year (2016), and the lead investigator of DoJ's special council would question whether US researchers working for DARPA should conduct investigations in this matter is "acceptable"! While I was tempted to say back to him "What if this hacker hacked GOP? Would you want me to investigate him then?", I kept my cool and I told him that this is a question for DARPA's director, and not for me to answer.

(Emphasis added. Excerpted from Exhibit 1.)

40. In another email, an attorney for David Dagon summarized documents considered responsive to a subpoena issued to Georgia Tech by Special Counsel John Durham:

> On Jul 23, 2021, at 3:30 PM, Jody R Westby <westby@globalcyberlegal.com> wrote:
>
> Beth,
> At our direction, David made a list of documents/data sources that he thought would be responsive to the subpoena. They are:
> DARPA whitepapers
> Whitepaper on DNC attack attribution
> Analysis of attacks of EOP (Executive Office of the President) networks
> Whitepaper for DOJ on APT-29 related hackers, crypto coin transactions, and analysis that includes Yota-related domains
> "Mueller List" - list of domains and indicators related to APT-28
>
> BLU Phones directory of files
>
> Rhamnousia chat logs
>
> We may have further information after we are able to speak to our client, but not sure when that will be at this point.   Hope this is helpful to you.
> Kind regards,
> Jody

(Emphasis added. Excerpted from Exhibit 2.)

41. Plaintiff has obtained a set of highly redacted "Rhamnousia chat logs" via an Open Records Request, which makes reference to individuals named "Manos" [Antonakakis]; "Angelos" [Keromytis]; "David" [Dagon]; and "Tejas" [Patel]. Antonakakis and Dagon are two of the cyber researchers connected to the Alfa Bank allegations, while Keromytis and Patel were employees of DARPA at the time.

42. In the chat logs, there are references to the hack of the DNC, including the sharing of public news reports on the hack in an apparent and approximate sequential manner, perhaps providing a rough indication of the dates of the chat, which appears to span several weeks.

43. In proximity to the sharing of a news story dated August 8, 2016 within the chat, the researchers are discussing the submission of a report, which is ultimately submitted via email between 2am and 3am one night:

"It's OK, you can FedEx it tomorrow morning for overnight",

"You will get the draft electronically in your personal email boxes by 2-3am. You will get a hard copy asap. This is the first thing I will do when I wake up. Need an address",

"I will get you specific mailing instructions by tomorrow morning. You should be able to follow the BAA guidance for sending mail but address it to Tejas Patel instead.",

(Rhamnousia chat logs)

44. These materials, obtained by the Plaintiff in cooperation with Margot Cleveland at *The Federalist*, prompted *Washington Examiner* reporter Jerry Dunleavy to make inquiries of DARPA, who in March 2022 **denied** any involvement in the investigation into the DNC hack on behalf of the organization or, to their knowledge, David Dagon and Manos Antonakakis.[11]

45. Specifically, Jared Adams, Chief of Communications for DARPA stated "DARPA was not involved in efforts to attribute the DNC hack. Dr. Antonakakis worked on DARPA's Enhanced Attribution program, which did not involve analysis of the DNC hack. Further,

---

[11] See
https://www.washingtonexaminer.com/news/justice/durham-related-emails-prompt-darpa-to-deny-involvement-in-attributing-2016-dnc-hack-to-russia. Accessed October 10, 2023.

DARPA was not involved in efforts to attribute the Guccifer 2.0 persona, nor any involvement in efforts to attribute the origin of leaked emails provided to Wikileaks."

46. Jared Adams added "to the best of our knowledge, no DARPA-funded researchers investigated" [the DNC hack]. This stood in contrast to numerous emails showing or alleging DARPA had tasked the cyber researchers to investigate the DNC hack, including the email from Antonakakis included as Exhibit 1.

47. Recently, Senator Chuck Grassley released a letter sent from DARPA in September 2022, which DARPA provided in response to inquiries he had made regarding materials obtained by the Plaintiff referenced above.

48. This letter confirms that these Clinton-connected researchers provided a report to the US government on attribution for the hack of the Democratic National Committee, and appears to correspond to the 2am report alluded to in the Rhamnousia chat logs:

> The enclosed August 7, 2016, document titled "Fancy Bear / APT28 Attribution Analysis" may correspond to the "Whitepaper on DNC attack attribution" referenced in the April 28 letter. Before the start of the EA program, the Georgia Tech team conducted research on the publicly-reported July 2016 Fancy Bear/APT-28 campaign and provided the results to researchers at DARPA, likely to highlight the capabilities of their technical approach. The Georgia Tech team had submitted a proposal for work on the EA program and had been notified they had been selected to negotiate on a contract award, but the research conducted in this report was done of their own volition and was not paid for by DARPA. The document provides an analysis of the origins of the command-and-control (C2) servers, observations about the domain registrar system used by attackers, and indicators of the attack domains being resolved by other sensitive networks.

(Except from Exhibit 3).

49. DARPA, who had previously claimed no knowledge of this report, provides a feeble explanation that this report was produced "***likely*** to highlight the capabilities of their technical research." (Emphasis added). In other words, DARPA doesn't know what is going on or they are lying about it to a United States Senator who is attempting to conduct oversight.

50. A letter dated September 28, 2020 from attorneys for David Dagon arguing to have his legal fees paid for by the State of Georgia and obtained by Plaintiff from an Open Records Request, clarifies the issue:

**Work Performed by Mr. Dagon for Georgia Tech That is Subject to the Investigation**

The work that Mr. Dagon did on attribution analysis of communications traffic, which relates to the current legal matter, involved research on the Democratic National Convention hack, the Advanced Persistent Threat-28 (APT-28) malware, analysis of potential attack traffic related to the 2016 election (including traffic between the Trump Organization, Spectrum Health, and Alfa Bank), and analysis of Yota phone communications traffic. This work is no less within the scope of Mr. Dagon's employment than the work he did on the Mariposa botnet.

Indeed, much of this work was done in preparation for and in fulfillment of the obligations of the multi-million-dollar DARPA contract he helped bring to Georgia Tech (and about which the University similarly issued a press release). To suddenly decide that this attribution work was "not within the scope of Mr. Dagon's employment" would, of course, put this funding at risk, and would similarly implicate any remedies or defenses the University may have under O.C.G.A. 50-21-25, not only with respect to the Durham investigation, but generally. In short, Mr. Dagon's attribution research was not a frivolous pursuit, but was integral to the research he secured for Georgia Tech. Any assertion to the contrary is disingenuous.

As we noted in our previous call, when Mr. Dagon undertook a thorough review of work related to the investigation, which was performed from the end of 2016 forward, *he discovered that almost all of the initial work performed by him was on behalf of Georgia Tech under the DARPA contract: the work related to queries submitted by the U.S. Department of Justice (DOJ) through DARPA regarding Russian communications between Alfa Bank and the Trump organization and Mr. Trump's use of a Russian Yota phone — the exact subject matter of the criminal Grand Jury subpoena that Mr. Dagon received from the Durham Investigation.* The requests were sufficient to require Mr. Dagon and Prof. Antonakakis ("Manos") to set up a file within the DARPA project called "DOJ" and a sub file called "Mueller" because they knew that these requests were coming from DOJ and being sent back (via DARPA) to DOJ and the Mueller investigation.

This is precisely what the Durham investigators are looking at – the work Mr. Dagon did under the DARPA contract on behalf of Georgia Tech. In particular, the research that Mr. Dagon conducted on DNS records starting in late 2016 and continuing through early 2017, and the research he conducted related to the Yota phone were always conducted as part of Mr. Dagon's duties as a security researcher employed by Georgia Tech.

This work was in furtherance of his duties and obligations at Georgia Tech; it was for the benefit of Georgia Tech; and it was within the scope of his employment at Georgia Tech. In addition, his response to first the FBI/DOJ inquiries that were made through DARPA, and his later response to the grand jury subpoena and other investigative queries have always been within the scope of his employment and meticulously coordinated with his employer.

(Emphasis added. Excerpted from Exhibit 4.)

51. This letter states that Dagon and Antonakakis worked on the DNC hack investigation, and also provided materials to the DOJ ("Department of Justice") and [Special Counsel Robert] Mueller "via DARPA."

52. The letter states these taskings began at the end of 2016 and continued.

53. A common understanding for the public is that the government worked in partnership with Crowdstrike, an IT vendor contracted by the Democratic National Committee during 2016 to analyze the DNC's compromised systems, and in some form took information from Crowdstrike and corroborated it (while not getting direct access to the DNC servers themselves). This false narrative was bolstered by misleading statements such as the June 8, 2017 testimony from former FBI Director Jim Comey in the following exchange:[12]

---

[12] Obtained from https://www.politico.com/story/2017/06/08/full-text-james-comey-trump-russia-testimony-239295. June 8, 2017 Testimony from James Comey)

**COMEY:** In the case of the DNC, and I believe the D triple C, but I'm sure the DNC, we did not have access to the devices themselves. We got relevant forensic information from a private party, a high class entity, that had done the work but we didn't get direct access.

**BURR:** But no content.

**COMEY:** Correct.

**BURR:** Isn't content an important part of the forensics from a counter-intelligence standpoint?

**COMEY:** It is but what was briefed to me by the people who were my folks at the time is that they had gotten the information from the private party that they needed to understand the intrusion by the spring of 2016.

54. This testimony is misleading, suggesting that the FBI had obtained everything they needed from Crowdstrike soon after the hack of the DNC.

55. As shown by Defense Exhibits 147[13] and 151[14] of the Michael Sussmann trial, the FBI had apparently not received anything but redacted Crowdstrike reports by October 2016 and had obtained little-to-no data or forensic information, which was still being requested by the FBI. The compromised servers at the DNC had apparently not even been imaged to capture any indicators of compromise before the remediation event.

56. This indicates that for the October 7, 2016 joint attribution statement released by DHS/ODNI (which directly relates to request DF-2022-00401), other materials in the government's possession must have been used to support attribution for the hack to Russia. Plaintiff notes that the government has sent a litigation consultation request to the Department of Defense, where the cyber researchers are known to have ties, including but not limited to DARPA.

57. Upon knowledge and belief, the United States government relied on work-product provided by these cyber researchers with ties to Hillary Clinton who, at the same approximate time of drafting their report on the DNC hack, were drafting the Alfa Bank

---

[13] See https://www.documentcloud.org/documents/22046130-dx-147_redacted. Accessed October 10, 2023.

[14] See https://www.documentcloud.org/documents/22046128-dx-151_redacted. Accessed October 10, 2023.

white papers seeking to support an "inference" and a "narrative" satisfactory for Hillary Clinton.

58. Attributing the hack to Russia served the political objectives of Hillary Clinton, who sought to play up claims of Russian interference and a narrative of collusion with Donald Trump.

59. The American people deserve to see all the responsive documents, and this Court should infer bad faith on the part of the government in the excessive delay in processing of these FOIAs, the improper exemption claims, the inaccurate statements issued publicly by DARPA, as well as the failure to disclose these embarrassing facts in a multitude of investigations or in response to numerous FOIA's submitted by dozens of Americans seeking records relating to the DNC hack and related investigations.

## **Further Indications of Bad Faith Supporting Discovery**

60. The circumstances of Plaintiff's request are unprecedented. It appears the United States government received and relied on materials provided by cyber researchers working at the direction of, and for the benefit of, a political campaign that orchestrated a significant disinformation campaign during and subsequent to the 2016 election, including the creation and dissemination of the Steele dossier now known to be fabricated whole cloth.

61. The United States has formally accused a foreign nation of conducting a hack and influence campaign while promoting falsehoods and inaccuracies about the information it has in its possession and omitting and failing to disclose facts embarrassing to the government.  For years, the government has known that cyber researchers connected to Hillary Clinton had provided materials on the hack of the DNC to Special Counsel Robert Mueller.

62. Numerous investigations have passed without the disclosure of the role of these cyber researchers in the DNC hack investigation, including the Special Counsel John Durham investigation, Special Counsel Robert Mueller investigation, Inspector General Michael Horowitz investigation, and Congressional investigations.

63. Despite the FBI having the understanding by October 2016 that David Dagon had authored one of the white papers on the Alfa Bank allegations,[15] he was allowed to work on additional investigations including providing materials to Special Counsel Mueller (who was appointed in May 2017).

64. The team for Special Counsel Robert Mueller were issued 96 phones, of which 59 remain unaccounted for.[16]

65. Of the 37 phones returned, 27 were found to be completely wiped, either by entering the wrong password too many times, or with a factory reset.[17]

66. Additional inquiries have been submitted by members of the United States Senate, explicitly requesting information on the roles of Antonakakis, Dagon, and DARPA in the DNC hack investigation.[18] Few responses have been given, and the lone September 2022 response from DARPA to Senator Grassley is contradicted by other documents. Either DARPA is lying to Senator Grassley or doesn't seem to know what is going on under its own roof. Both explanations cry out for discovery at DARPA to ensure compliance with FOIA.

67. The government knows all of these materials would be disclosed to Russian intelligence officers indicted by Special Counsel Robert Mueller on July 13, 2018 in *United States v Netyksho et al.*, pursuant to *Brady v Maryland 373 U.S. 83.* The government is more willing to disclose this information to foreign intelligence officers than it is to its own people. This is antithetical to the design and intent of the Freedom of Information Act.

## UTILITY OF DISCOVERY

68. To the Department of Defense, Plaintiff has submitted two FOIA requests for documents directly relating to the contradictory and erroneous public statements issued by the Agency.

---

[15] See https://www.documentcloud.org/documents/22052280-sussmann-trial-523-afternoon. Allison Sands Testimony. Pg 128-129. Accessed October 10, 2023.
[16] See https://www.washingtonexaminer.com/news/grassley-says-garland-stonewalling-on-missing-and-wiped-mueller-team-phones. Accessed October 10, 2023.
[17] See https://www.yahoo.com/video/least-27-phones-special-counsel-212933558.html. Accessed October 10, 2023.
[18] Obtained https://www.grassley.senate.gov/imo/media/doc/johnson_grassley_to_darpa.pdf. Accessed October 10, 2023.

   a. One DOD FOIA relates to the use of DARPA resources in the aid of criminal investigations and prosecutions by the FBI and DOJ. DARPA's letter to Senator Grassley falsely indicates DARPA resources were not used in the DNC attribution work, and falsely claims the attribution analysis was only a test of capabilities.

   b. The second DOD FOIA relates to emails sent to or from Angelos Keromytis who is one of two known DARPA officials with knowledge of the DNC hack attribution analysis. Per Exhibit 4, these materials flowed "via DARPA" to the DOJ and FBI.

69. No affidavit from the Department of Defense, if one were to be produced, could be relied upon given the circumstances. Discovery is needed to identify responsive records that DARPA publicly denied existed, and any motivations behind hiding such records.

70. The FBI FOIA that Plaintiff requests discovery on requests materials provided by David Dagon or Manos Antonakakis. The government recently issued a GLOMAR response also citing personal privacy exemptions and refused to confirm or deny the existence of records.

   a. This is transparently an attempt to shield the agency from embarrassment and public scrutiny, having relied on researchers connected to Hillary Clinton, who were known to have provided highly questionable data on Alfa Bank. This is expressly disallowed by Executive Order 13526.

71. At the ODNI, the agency flatly refuses to revisit its "final response" issued prior to the filing of this lawsuit in regards to DF-2022-00400 seeking records from the cyber researchers despite a timely appeal filed prior to the commencement of litigation by Plaintiff. As an extension of the same subject matter, DF-2022-00401 is specific to the joint-attribution statement which ODNI was a party to.

   a. The withholding of records is a brazen effort to hide the role of these cyber researchers and conceal the embarrassment of having relied on them.

   b. Amidst the complex relationships between agencies, discovery will enable Plaintiff to identify responsive records from agencies and personnel who may desire to withhold them.

72. Further, there is documented destruction of evidence whereby members of the Special Counsel Mueller team wiped their phones, which may have destroyed communications

with the cyber researchers or their DARPA intermediaries. Only discovery could ascertain the impact of the destruction, the location and existence of records, and the recoverability of responsive records.

## CONCLUSION

73. The government is acting in bad faith to hide the role of researchers tied to Hillary Clinton in blaming Russia for the hack of the Democratic National Committee. The motivation is clearly to avoid the scrutiny and questions that are sure to come.

74. Understandably, the Government is embarrassed by these long-secret revelations, but this is expressly addressed in Executive Order 13526, Sec. 1.7 (a) (1) and (a) (2), which state:
   (a) In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to:
   (1) conceal violations of law, inefficiency, or administrative error;
   (2) prevent embarrassment to a person, organization, or agency;

75. Given the Government's conflicting statements, the potential of misconduct and the likelihood of embarrassment, any affidavit provided by the government in this case could not be relied on absent an opportunity for discovery. It is the government's actions and the question of corruption that are the very heart of the question raised by the Plaintiff.

76. If granted, Plaintiff will submit a plan for discovery which may include a limited number of depositions of certain persons knowledgeable about the underlying events and the existence of documents.

Respectfully submitted,

Dated: October 13, 2023

Ryan Milliron, Pro Se