**FILED - GR**
February 29, 2024 8:42 AM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:JMW SCANNED BY: JW / 2-29

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| RYAN MILLIRON | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case No. 1:23-cv-30 |
| | § | |
| U.S. DEPARTMENT OF DEFENSE, | § | Hon. Jane M. Beckering |
| CENTRAL INTELLIGENCE | § | U.S. District Judge |
| AGENCY, | § | |
| FEDERAL BUREAU OF | § | Hon. Sally J. Berens |
| INVESTIGATION, | § | U.S. Magistrate Judge |
| OFFICE OF THE DIRECTOR OF | § | |
| NATIONAL INTELLIGENCE | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT FEDERAL BUREAU OF INVESTIGATION

# INTRODUCTION

In a case of unusual gravity under the Freedom of Information Act, the government has undertaken a campaign of brazen gamesmanship to protect themselves from the public disclosure of documents that will demonstrate misconduct on a level unseen in the last 50 years of government investigations. The burden is on the government to sustain its action under 5 U.S.C. § 552(b), and the government hasn't made the necessary showing. Disclosure rather than secrecy is the "dominant objective of the Act" *Judicial Watch, Inc. v. Dept. of State*, D.D.C. No. 1:13-cv-01363-EGS quoting McKneely v. United States Dept. of Justice, 2015 WL 5675515 at *2 (D.D.C. 2015). Moreover, given the nature of the documents known to exist, the presumption of good faith normally afforded to the government must be pierced. The government contends it can hide the very corruption and misconduct FOIA was intended to expose by simply invoking GLOMAR and claiming an exemption. In this, the government is mistaken.

# BACKGROUND

Request No. 1558747-000. In response to Plaintiff's request for "...any reports, emails, memorandums, or letters in the FBI's possession relating to the hack of the DNC or Guccifer 2.0 that were provided by [Manos] Antonakakis or [David] Dagon, the government has asserted GLOMAR, refusing to confirm or deny the existence of documents. The government contends that the mere acknowledgement of the existence of FBI records could reasonably be expected to constitute an unwarranted invasion of Antonakakis and Dagon's personal privacy interests.

The government has reserved a second bite of the apple to later argue in support of exemptions 6 and 7(C) – both of which are exemptions that require a balancing test between the need for secrecy and the public interest.

During the 2016 election, Hillary Clinton effected a campaign to play up claims of Russian interference and a collusion narrative against her opponent, Donald Trump. As part of these efforts, cyber researchers Manos Antonakakis and David Dagon of Georgia Tech provided analysis and alleged authorship to a set of allegations making claims of a secret communications channel between Trump and Vladimir Putin, allegedly using intermediary connections through Alfa Bank and Spectrum Health, hereafter referred to as the "Alfa Bank allegations." These

allegations were introduced to the public first via a Wordpress blog published no later than October 5, 2016.[1]

The data purporting to support the allegations was uploaded to a fileshare website called Mediafire the prior day on October 4, 2016.[2] At the same approximate time, operatives of Fusion GPS[3], with whom the cyber researchers were coordinating, began a pressure campaign to get journalists to cover the allegations:

| | |
|---|---|
| **From:** | Peter Fritsch <pfritsch@fusiongps.com> |
| **Sent:** | Wednesday, October 5, 2016 5:32 PM |
| **To:** | Michael Isikoff <misikoff@yahoo-inc.com> |
| **Subject:** | alfa |
| **Attach:** | Alfa Group Overview 9.1.16.docx |

<<...>>
off the record — all open source tho

| | |
|---|---|
| **From:** | Peter Fritsch <pfritsch@fusiongps.com> |
| **Sent:** | Wednesday, October 5, 2016 5:44 PM |
| **To:** | Eric Lichtblau <ericl@nytimes.com> |
| **Subject:** | alfa and trump |
| **Attach:** | gdd.zip; ATT00001.htm |

fyi found this published on web...and downloaded it. super interesting in context of our discussions

http://www.mediafire.com/file/qc68pt5k6wn9f64/gdd.zip

---

[1] See https://gdd53.wordpress.com/. Accessed February 16, 2024.
[2] See http://www.mediafire.com/file/qc68pt5k6wn9f64/gdd.zip. Accessed February 16, 2024.
[3] Fusion GPS was an opposition research firm hired by the Hillary Clinton campaign during 2016 who in turn contracted Chistopher Steele to compile what is colloquially known as the "Steele dossier."

| | |
|---|---|
| **From:** | Peter Fritsch <pfritsch@fusiongps.com> |
| **Sent:** | Tuesday, October 18, 2016 4:02 PM |
| **To:** | Mark Hosenball <Mark.Hosenball@thomsonreuters.com> |
| **Subject:** | Re: i heard |

it's everyone's problem. call david dagon at georgia tech

> On Oct 18, 2016, at 11:12 AM, Mark Hosenball@thomsonreuters.com wrote:
>
> Yes I know but the problem is that the nature of the data is way above my level of competence...
>
> -----Original Message-----
> From: Peter Fritsch [mailto:pfritsch@fusiongps.com]
> Sent: Tuesday, October 18, 2016 11:10 AM
> To: Hosenball, Mark J. (Reuters News)
> Subject: Re: i heard
>
> Ugh
>
> Sent from my iPhone
>
>> On Oct 18, 2016, at 11:04 AM, "Mark Hosenball@thomsonreuters.com" <Mark.Hosenball@thomsonreuters.com> wrote:
>>
>> the problem with the Alfa bank story at this point is that my cyber expert colleagues cannot satisfy themselves about the authenticity of some of the key data, which they say from what they can tell is NOT public data. We are in contact with your experts via different channels but my colleague Joe Menn in Silicon Valley still hasn't got the confidence he says he needs to understand where all the data originated. If you can help more with this pls do...
>>
>> -----Original Message-----
>> From: Peter Fritsch [mailto:pfritsch@fusiongps.com]
>> Sent: Tuesday, October 18, 2016 11:01 AM
>> To: Hosenball, Mark J. (Reuters News)
>> Subject: Re: i heard
>>
>> when is he coming?
>>
>> meantime, do the fucking alfa bank secret comms story. it is hugely important. forget the wikileaks sideshow
>>

| | |
|---|---|
| **From:** | Michael Isikoff <misikoff@yahoo-inc.com> |
| **Sent:** | Monday, October 31, 2016 12:39 PM |
| **To:** | Peter Fritsch <pfritsch@fusiongps.com> |
| **Subject:** | Re: Server |

Will call in half an hour or so

Sent from Yahoo Mail for iPhone

On Monday, October 31, 2016, 7:30 AM, Peter Fritsch <pfritsch@fusiongps.com> wrote:

Big story on the trump Alfa server moving early pm. OTR. USG absolutely investigating. Campaign will light it up I imagine

Sent from my iPhone

(Excerpts)[4]

---

[4] These excerpts were obtained from *United States v. SUSSMANN*, 1:21-cr-00582, (D.D.C. Apr 25, 2022) ECF No. 98.

Plaintiff has also obtained an email from an Open Records Request sent from Franklin Foer to David Dagon, sent days before Foer published the first story in the media on the allegations.[5]

> **From:**  Franklin Foer<flfoer@gmail.com>
> **Sent on:** Saturday, October 22, 2016 7:55:34 PM
> **To:**  dd92@gatech.edu
> **Subject:** Trump/Russia article
>
> David,
> I'm a reporter with Slate magazine. I've just been explained the Alfa Bank/Trump story. My sense is that other reporters have called on you for help--and that this is a somewhat frustrating process. I wish the New York Times had published its story. This is a crucial piece of reporting. As you will see, I have been on the Trump/Russia case before pretty much anyone. I began writing about Paul Manafort's ties back in April. Then I wrote this story in early July.
>
> http://www.slate.com/articles/news_and_politics/cover_story/2016/07/vladimir_putin_has_a_plan_for_destroying_t
>
> (Here's my Manafort story
> http://www.slate.com/articles/news_and_politics/politics/2016/04/paul_manafort_isn_t_a_gop_retread_he_s_made_
> –
>
> In both cases, my articles helped drive coverage in the MSM.
>
> Would it be possible to talk? I've been presented with the underlying facts of the story and find them completely convincing. I've explained the facts to my editors and they want me to push to get the piece done quickly. I have their complete and total backing. But before I can publish, I need some help from a well-versed expert such as yourself.
>
> Many thanks, Franklin Foer

Special Counsel Durham alleged in the indictment of Michael Sussmann that these researchers were tasked by Rodney Joffe[6] to establish evidence supporting an "inference" and "narrative" regarding Trump that would please certain "VIPs"[7]...", later identified as the Hillary Clinton campaign.  These three cyber researchers as a group were in communication with

---

[5] See
https://www.slate.com/articles/news_and_politics/cover_story/2016/10/was_a_server_registered_to_the_trump_organization_communicating_with_russia.html. Accessed February 18, 2024.
[6] Although the indictment does not name these third parties, subsequent filings, public documents, and public reporting have substantiated the identities as indicated by the Plaintiff. See
https://thefederalist.com/2021/11/17/emails-show-researchers-who-alleged-trump-links-to-russian-alfa-bank-were-anti-trump/. Accessed February 16, 2024.
[7] See https://www.justice.gov/sco/press-release/file/1433511/download. Accessed February 16, 2024.

members of the Clinton campaign and Fusion GPS, an opposition research firm hired by Perkins Coie who in turn contracted Christopher Steele to compile a dossier on Donald Trump.

The allegations were deeply flawed, and have been widely discredited by the FBI, CIA, and numerous independent reviews, some of which allege malicious intentions.[8] FBI efforts to corroborate the allegations included obtaining data logs from the host of the marketing server, and they could not establish the legitimacy or authenticity of the data.[9]

By early October 2016, the FBI became aware of David Dagon's role in the Alfa Bank allegations.[10] The FBI agents running the investigation made multiple requests for authorization to interview David Dagon, but were rebuffed by the leaders of the FBI[11]:

Public reporting establishes that work on the Alfa Bank allegations, as it relates to Antonakakis and Dagon, occurred during the period of June 14, 2016 through September 19, 2016. During this same period in which they had been tasked to establish an "inference" and "narrative" satisfactory for Hillary Clinton, Antonakakis and Dagon also provided the United States government with an attribution analysis on the hack of the Democratic National Committee, which was dated August 7, 2016.

> The enclosed August 7, 2016, document titled "Fancy Bear / APT28 Attribution Analysis" may correspond to the "Whitepaper on DNC attack attribution" referenced in the April 28 letter. Before the start of the EA program, the Georgia Tech team conducted research on the publicly-reported July 2016 Fancy Bear/APT-28 campaign and provided the results to researchers at DARPA, likely to highlight the capabilities of their technical approach. The Georgia Tech team had submitted a proposal for work on the EA program and had been notified they had been selected to negotiate on a contract award, but the research conducted in this report was done of their own volition and was not paid for by DARPA. The document provides an analysis of the origins of the command-and-control (C2) servers, observations about the domain registrar system used by attackers, and indicators of the attack domains being resolved by other sensitive networks.

This attribution analysis was provided first to the Defense Advanced Research Projects Agency ("DARPA").

---

[8] See https://justthenews.com/sites/default/files/2020-04/Ankura_AlfaBank_ResearchAnalysis_Apr2020dh.pdf.pdf.pdf. Independent IT firm analysis alleging malfeasance. See also: https://www.washingtonexaminer.com/?p=76426 and https://www.washingtonexaminer.com/?p=1268165. Accessed February 18, 2024.
[9] See https://www.documentcloud.org/documents/22052281-sussmann-trial-524-morning. Pg's 51-53. Accessed February 18, 2024.
[10] See https://www.documentcloud.org/documents/22052280-sussmann-trial-523-afternoon. Testimony of FBI Agent Ryan Gaynor. Pg 38.
[11] See https://www.documentcloud.org/documents/22052279-sussmann-trial-523-morning. Testimony of FBI Agent Ryan Gaynor. Pg 92.

DARPA has previously made false statements denying any role in investigating the hack of the DNC. Specifically, Jared Adams, Chief of Communications for DARPA stated "DARPA was not involved in efforts to attribute the DNC hack. Dr. Antonakakis worked on DARPA's Enhanced Attribution program, which did not involve analysis of the DNC hack. Further, DARPA was not involved in efforts to attribute the Guccifer 2.0 persona, nor any involvement in efforts to attribute the origin of leaked emails provided to Wikileaks."[12]

Plaintiff has obtained memorandums of understanding that allow DARPA to assist in FBI investigations. *See* Exhibit 1.

Plaintiff has obtained a series of public communications from David Dagon and Manos Antonakakis sent to colleagues at Georgia Tech and officials of the State of Georgia in which they explicitly reference their role in the DNC hack investigation.

These emails and letters demonstrate that documents exist and are responsive to Plaintiff's request to the FBI for "..any reports, emails, memorandums, or letters in the FBI's possession relating to the hack of the DNC or Guccifer 2.0 that were provided by Antonakakis or Dagon." *See* Exhibits 2-4.[13]

Request No. 1561520-000. Plaintiff has requested "any referrals, 302's, 1023's, or other reports documenting information obtained from Igor Danchenko as a confidential human source for the FBI."

The government maintains that every responsive record must be withheld, despite one 302 being publicly released in July 2020 by the Senate Judiciary Committee and the *Danchenko* trial covering portions of other interviews.[14]

During the 2016 election, Christopher Steele was engaged by Fusion GPS to compile a dossier on Donald Trump. As part of his work, Fusion GPS arranged contacts between Steele and the media, including as one example, Michael Isikoff of Yahoo News. Isikoff then authored a

---

[12] See https://www.washingtonexaminer.com/news/justice/durham-related-emails-prompt-darpa-to-deny-involvement-in-attributing-2016-dnc-hack-to-russia. Accessed February 18, 2024.
[13] For brevity, Plaintiff is including 3 exhibits in which the references to this work are most explicit. Plaintiff has additional materials that are more allusory in nature of their work on the DNC hack.
[14] See https://www.judiciary.senate.gov/imo/media/doc/February%209,%202017%20Electronic%20Communication.pdf. Accessed February 28, 2024.

September 23, 2016 article[15] based on dossier report #94[16] which among other things falsely alleged Carter Page met with Igor Sechin in Moscow to negotiate a collusive scheme between the Trump campaign and Russia.

This Yahoo News article, in addition to circular reporting provided by Steele as a Confidential Human Source to the FBI, comprised a substantial portion of the application for a Foreign Intelligence Surveillance Act (FISA) warrant against Carter Page.[17]

Post election, the FBI finally began the task of attempting to validate the sourcing of the Steele dossier. The FBI came to learn that Steele's reporting, according to him, relied on a single subsource named Igor Danchenko.[18]

Igor Danchenko in turn, allegedly maintained a network of subsources providing intelligence. Danchenko, it was alleged, was a "Russian-based" operative in all 4 FISA warrant applications against Carter Page.

However, Danchenko had relocated to the United States years before, spending time at the University of Louisville between 2003 and 2005 as a teaching assistant before joining the Brookings Institute in Washington DC. While working at Brookings in 2009, Danchenko became the target of an FBI investigation that lasted into 2011 after it was believed he was operating as an asset for Russian intelligence.[19]

The subsources upon which Danchenko alleged to have sourced salacious details were in no obvious positions to provide intelligence. Olga Galkina was a resident of Cyprus working as a public relations executive at Webzilla. Her employer had filed a police report against her for showing up to work intoxicated, and had terminated her around the time an allegation was included in the dossier that alleged Webzilla had a role in the hacking of the DNC in the aid of

---

[15] See https://news.yahoo.com/news/u-s-intel-officials-probe-ties-between-trump-adviser-and-kremlin-175046002.html. Accessed February 18, 2024.

[16] See https://www.documentcloud.org/documents/3259984-Trump-Intelligence-Allegations. Pg 9. Accessed February 18, 2024.

[17] See https://www.documentcloud.org/documents/4365338-Nunes-memo. Congressman Devin Nunes memo. Pg 4. Accessed February 18, 2024.

[18] See https://www.justice.gov/sco/press-release/file/1446386/download. *Danchenko* indictment at 2.

[19] See https://www.cbsnews.com/news/senate-judiciary-chair-lindsey-graham-releases-new-details-about-source-of-steele-dossier/. Accessed February 18, 2024.

Donald Trump. Galkina signed a sworn affidavit affirming she never provided this or any other information to Danchenko.[20]

Ivan Vorontsov is the founder and editor-in-chief of *Banks-Finance.ru,* a website that covers financial news. Vorontsov was attributed by Danchenko to a dossier claim that Russian prostitutes had urinated on President Trump in a hotel in Moscow. Vorontsov signed a sworn affidavit affirming he never provided this or any other information to Danchenko.[Id]

Likewise, another alleged subsource named Sergey Abyshev signed a sworn affidavit affirming he never provided any dossier information to Danchenko.[Id]

Lyudmila Podobedova was a journalist covering the oil and gas sector. To her, claims that Carter Page met with Igor Sechin were attributed by Danchenko, an allegation that later showed up in the Yahoo News article from Isikoff, which was later used to support the FISA warrants against Carter Page. She also signed a sworn affidavit affirming she never provided any dossier information to Danchenko.[Id]

Sergei Millian was an alleged subsource with whom Danchenko never spoke. Millian was a Trump supporter who had been the target of a bizarre effort of unclear purposes from Fusion GPS and certain cyber operatives throughout the summer of 2016. Danchenko suggested that he'd heard Millian speak on YouTube videos, and emailed Millian twice to establish contact, with no response from Millian. Danchenko alleged that one night, he received a phone call from someone who did not identify himself, but sounded like Millian. To him, certain claims were attributed for the very first Steele dossier report.

These allegations from Danchenko were fabricated. No phone call records exist.[21]

Still, Danchenko attributed dossier allegations to Millian from this alleged phone call purportedly lasting just 15 minutes that alleged Trump and the Russian government as having a "well developed conspiracy of cooperation."

In interviews with the FBI, Danchenko also omitted the fact that he had obtained information from a long time associate of Bill and Hillary Clinton named Chuck Dolan.

---

[20] See FRIDMAN v. BEAN LLC, 1:17-cv-02041, (D.D.C.).
https://www.courtlistener.com/docket/6163126/fridman-v-bean-llc/?page=2 ECF 153. Exhibits [D-I].
[21] *See United States v. Danchenko*, 1:21-cr-00245, (E.D. Va.).
https://www.courtlistener.com/docket/60698540/united-states-v-danchenko/. ECF No. 113. Transcript 245-248. See also ECF No 115. Transcript 323-325.

Danchenko never disclosed to the FBI that dossier information had in fact been sourced from Dolan.[22]

Inspector General Michael Horowitz released a report in 2019 identifying 17 material errors or omissions in 4 FISA warrants obtained against Carter Page. Some of these errors directly relate to FBI misconduct in relation to Danchenko. For example, during his first interview with the FBI, Danchenko contradicted material assertions made in Steele's reporting and described his sourcing of information as coming from rumors and bar talk. The FBI notes reflected Danchenko had been truthful and cooperative but the FBI never informed the FISA court or included in subsequent FISA applications against Carter Page that the dossier information they had been relying upon was only bar talk.[23]

In March 2017 as Congressman Devin Nunes was beginning an investigation into the events of 2016, the FBI made Igor Danchenko a confidential human source (CHS) for the FBI, in an apparent attempt to shield themselves from scrutiny. He remained a CHS until late 2020.

In July 2020, the Senate Judiciary Committee released a 302 transcript of one Danchenko interview.[24] Portions of other interviews are described throughout the indictment of Danchenko and subsequent trial. Other interviews have not been described or released in any manner or portion.

## ARGUMENT

The government cannot hide its misconduct behind frivolous GLOMAR claims, nor deny the public's access to documents that would allow them to ask questions and scrutinize the decisions of government officials. The government's position with respect to these two FOIA requests is antithetical to the design and intent of the Freedom of Information Act. FOIA was designed by Congress to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Judicial Watch, Inc. v. Dept. of State*, D.D.C. No. 1:13-cv-01363-EGS quoting Morley v. C.I.A., 508 F.3d 1108, 1114 (D.C. Cir. 2007) (internal citations omitted).

---

[22] See *United States v. Danchenko*, 1:21-cr-00245, (E.D. Va.). https://www.courtlistener.com/docket/60698540/united-states-v-danchenko/. ECF No. 115. Transcript 330-331.
[23] See https://www.justice.gov/storage/120919-examination.pdf. Pg 15.
[24] See https://www.judiciary.senate.gov/imo/media/doc/February%209,%202017%20Electronic%20Communication.pdf.

**Request No. 1558747-000 (GLOMAR - Exemptions 6 & 7C).** "...any reports, emails, memorandums, or letters in the FBI's possession relating to the hack of the DNC or Guccifer 2.0 that were provided by [Manos] Antonakakis or [David] Dagon."

The government has taken a novel position, even in regards to GLOMAR, in response to the Plaintiff's FOIA. After substantial research, Plaintiff is unable to locate any case law where the government refused to confirm or deny the existence of documents that they, in theory, could have an obligation to disclose as soon as tomorrow. The responsive records would be required to be disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) to the defendants in *United States v. Netyksho*, 1:18-cr-00215, (D.D.C.). Plaintiff cannot locate another instance where GLOMAR was invoked subsequent to an indictment for materials falling under *Brady*, suggesting it has perhaps never before occurred, or, it's exceedingly rare.

The reason for this is obvious, the privacy interests are already set to be vacated whenever the government apprehends and prosecutes the defendants.

Adding to this are a series of public communications from Antonakakis and Dagon that demonstrate that responsive records exist, and that any privacy interests the government cites in justification for GLOMAR have in effect, been waived.

In *Lindsey v. FBI*, 271 F. Supp. 3d 1 - Dist. Court, Dist. of Columbia 2017, the FBI similarly invoked GLOMAR while citing exemptions 6 and 7C.[25] There, as is the case here, the third party subject of the FOIA request had made public statements demonstrating the existence of responsive records. In ruling against the FBI, the court found "Even a modicum of public interest may suffice to warrant disclosure, if public acknowledgments by Mr. Hage have vitiated the claimed privacy interests in this matter."

In numerous public communications to colleagues at Georgia Tech, both Dagon and Antonakakis have demonstrated the existence of responsive records[26]:

---

[25] The government's reliance on *Rugiero v. U.S. Dept. of Justice*, 257 F.3d 534 (6th Cir. 2001) is misplaced in regards to exemption 7C. The agencies here have made no effort or showing to balance the public interest against the privacy interests cited, which was integral to *Rugiero*.
[26] Excerpts of emails included in full as Exhibits 2-4. Highlighting added.

Finally, I will leave you with an anecdote and a thought. During one of my interviews with the Special Counsel prosecutor, I was asked point blank by Mr. DeFilippis, "Do you believe that DARPA should be instructing you to investigate the origins of a hacker (Guccifer_2.0) that hacked a political entity (DNC)?" Let that sync for a moment, folks. Someone hacked a political party (DNC, in this case), in the middle of an election year (2016), and the lead investigator of DoJ's special council would question whether US researchers working for DARPA should conduct investigations in this matter is "acceptable"! While I was tempted to say back to him "What if this hacker hacked GOP? Would you want me to investigate him then?", I kept my cool and I told him that this is a question for DARPA's director, and not for me to answer.

(Antonakakis to Georgia Tech colleagues)

> On Jul 23, 2021, at 3:30 PM, Jody R Westby <westby@globalcyberlegal.com> wrote:
>
> Beth,
> At our direction, David made a list of documents/data sources that he thought would be responsive to the subpoena. They are:
> DARPA whitepapers
> Whitepaper on DNC attack attribution
> Analysis of attacks of EOP (Executive Office of the President) networks
> Whitepaper for DOJ on APT-29 related hackers, crypto coin transactions, and analysis that includes Yota-related domains
> "Mueller List" - list of domains and indicators related to APT-28
>
> BLU Phones directory of files
>
> Rhamnousia chat logs
>
> We may have further information after we are able to speak to our client, but not sure when that will be at this point.  Hope this is helpful to you.
> Kind regards,
> Jody

(Attorney for David Dagon to state officials)

Work Performed by Mr. Dagon for Georgia Tech That is Subject to the Investigation

The work that Mr. Dagon did on attribution analysis of communications traffic, which relates to the current legal matter, involved research on the Democratic National Convention hack, the Advanced Persistent Threat-28 (APT-28) malware, analysis of potential attack traffic related to the 2016 election (including traffic between the Trump Organization, Spectrum Health, and Alfa Bank), and analysis of Yota phone communications traffic. This work is no less within the scope of Mr. Dagon's employment than the work he did on the Mariposa botnet.

Indeed, much of this work was done in preparation for and in fulfillment of the obligations of the multi-million-dollar DARPA contract he helped bring to Georgia Tech (and about which the University similarly issued a press release). To suddenly decide that this attribution work was "not within the scope of Mr. Dagon's employment" would, of course, put this funding at risk, and would similarly implicate any remedies or defenses the University may have under O.C.G.A. 50-21-25, not only with respect to the Durham investigation, but generally. In short, Mr. Dagon's attribution research was not a frivolous pursuit, but was integral to the research he secured for Georgia Tech. Any assertion to the contrary is disingenuous.

As we noted in our previous call, when Mr. Dagon undertook a thorough review of work related to the investigation, which was performed from the end of 2016 forward, *he discovered that almost all of the initial work performed by him was on behalf of Georgia Tech under the DARPA contract: the work related to queries submitted by the U.S. Department of Justice (DOJ) through DARPA regarding Russian communications between Alfa Bank and the Trump organization and Mr. Trump's use of a Russian Yota phone — the exact subject matter of the criminal Grand Jury subpoena that Mr. Dagon received from the Durham investigation.* The requests were sufficient to require Mr. Dagon and Prof. Antonakakis ("Manos") to set up a file within the DARPA project called "DOJ" and a sub file called "Mueller" because they knew that these requests were coming from DOJ and being sent back (via DARPA) to DOJ and the Mueller investigation.

This is precisely what the Durham investigators are looking at – the work Mr. Dagon did under the DARPA contract on behalf of Georgia Tech. In particular, the research that Mr. Dagon conducted on DNS records starting in late 2016 and continuing through early 2017, and the research he conducted related to the Yota phone were always conducted as part of Mr. Dagon's duties as a security researcher employed by Georgia Tech.

This work was in furtherance of his duties and obligations at Georgia Tech; it was for the benefit of Georgia Tech; and it was within the scope of his employment at Georgia Tech. In addition, his response to first the FBI/DOJ inquiries that were made through DARPA, and his later response to the grand jury subpoena and other investigative queries have always been within the scope of his employment and meticulously coordinated with his employer.

(Letter from Dagon's attorney's to Georgia Tech officials)

These emails demonstrate that the FBI and DOJ tasked Dagon and Antonakakis, with materials flowing "via DARPA" to Special Counsel Mueller who filed the *Netyksho* indictment. This included work done on attribution for the DNC hack, and included an analysis of "domains and indicators" of APT-28, the alleged Russian group the *Netyksho* defendants were working for.

In totality, they indicate that DARPA served as a conduit for these taskings and materials being transmitted to the FBI and DOJ and explicitly show Antonakakis was tasked to look at Guccifer 2.0, the persona associated with the 2016 DNC hack.

Adding to this is the fact that the researchers injected themselves into the public domain by serving as sources to public reporting around the Alfa Bank allegations. Dagon authored those allegations, which became central to a smear campaign Clinton and Fusion GPS were pushing against Donald Trump:

 **Hillary Clinton** ✔
@HillaryClinton
···

# Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank.



### Statement from Jake Sullivan on New Report Exposing Trump's Secret Line of Communication to Russia

*In response to a new report from Slate showing that the Trump Organization has a secret server registered to Trump Tower that has been covertly communicating with Russia, Hillary for America Senior Policy Adviser Jake Sullivan released the following statement Monday:*

"This could be the most direct link yet between Donald Trump and Moscow. Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank.

"This secret hotline may be the key to unlocking the mystery of Trump's ties to Russia. It certainly seems the Trump Organization felt it had something to hide, given that it apparently took steps to conceal the link when it was discovered by journalists.

"This line of communication may help explain Trump's bizarre adoration of Vladimir Putin and endorsement of so many pro-Kremlin positions throughout this campaign. It raises even more troubling questions in light of Russia's masterminding of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign. We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections."

8:36 PM · Oct 31, 2016 · TweetDeck

At the same time they were working on the Alfa Bank allegations, Dagon and Antonakakis authored the August 7, 2016 attribution analysis on the DNC hack. Mueller was appointed in May 2017, and later materials from the researchers flowed to Mueller as well.

That Dagon and Antonakakis have publicly acknowledged the existence of responsive documents flowing via DARPA to the DOJ and FBI is sufficient to negate GLOMAR, independent of anything else.

Still, there is an obvious and overriding public interest in these documents that would overcome exemptions 6 and 7C, each of which rest on a balancing test between the public interest and the privacy interests of the researchers. The government knew they had authored the Alfa Bank allegations and wanted to interview them, but never did. How did it come to pass that the DOJ and FBI began accepting materials and tasking them to provide additional materials on the DNC hack?

It is entirely possible, if not exceedingly likely, that the *Netyksho* indictment and the public's understanding of Russian interference in 2016 materially rest on these cyber researchers who provided data on the Alfa Bank allegations that couldn't be reproduced or found from the host of the marketing server. These documents would advance the public's understanding of what happened and create pointed questions to the Department of Justice on their conduct in the underlying investigation into the DNC hack.[27]

Refusing to acknowledge the existence of documents through GLOMAR is an extreme position that this court should reject. The government will retain an ability to redact any sensitive sections and re-argue over exemptions. The American people at least deserve the government's acknowledgement of what is already known, that documents exist, and that these cyber researchers connected to the Clinton campaign and the Alfa Bank allegations ended up working for the most important investigation in American history - Special Counsel Robert Mueller's.[28]

---

[27] The government alleges that "Plaintiff has not articulated a public interest in the disclosure of this material" (Seidel Decl. ¶¶ 16-18.) The government appears to have ignored Plaintiff's Motion for Discovery in this assessment. The government appears to improperly shift the burden to the Requestor to demonstrate a public interest rather than making any attempt of balancing these interests based on the responsive records. The government holds the burden of showing that exemptions have been properly invoked.

[28] See https://thefederalist.com/2022/04/22/docs-spygate-researchers-did-work-for-former-special-counsel-robert-mueller/. Accessed February 27, 2024.

**Request No. 1561520-000.** (Exemptions 7(D)-(F)) "Any referrals, 302's, 1023's, or other reports documenting information obtained from Igor Danchenko as a confidential human source for the FBI."

At issue is whether the government can insulate itself from scrutiny, embarrassment, and hide its misconduct by simply making an individual a confidential human source. Igor Danchenko fabricated claims, and made numerous material false statements and omissions both prior to and during his engagement as a CHS.

The government made Danchenko a CHS in March 2017 for the sole reason that they wanted to hide him from Congressional investigators[29] and continue a baseless investigation into Donald Trump by obtaining FISA warrants on Carter Page. Danchenko had provided no substantive or accurate information, other than what could be found through open source reporting, and had no connections of intelligence value. Danchenko was himself suspected of being a Russian spy, a fact known to the FBI prior to his engagement as CHS.

Congress did not intend for the executive branch to be able to shield itself from scrutiny in this manner. The intent of these exemptions only applies to good faith human source arrangements. Exemptions can only be valid when the responsive documents originate through a relationship made in due care and in furtherance of valid law enforcement activities.

The government omitted all derogatory information,[30] including the previous investigation into Danchenko as an alleged Russian spy, from Danchenko's initial validation documents.[31] Danchenko was improperly opened as a confidential human source. It is inconceivable that a suspected Russian spy would ever be made a CHS, because the FBI would be vulnerable to disinformation and influence of a foreign government if the suspicions were true. Danchenko was never cleared of these accusations, the investigation only ended when Danchenko was thought to have left the United States. The responsive records should be processed.

---

[29] See https://www.c-span.org/video/?425075-1/house-intelligence-committee-chair-nunes-russia-2016-elections.
March 7, 2017 Devin Nunes press conference announcing hearings with law enforcement and intelligence officials.
[30] See *United States v. Danchenko*, 1:21-cr-00245, (E.D. Va.).
https://www.courtlistener.com/docket/60698540/united-states-v-danchenko/. ECF No. 123. Transcript 879-880.
[31] See *AG Guidelines FBI Confidential Human Sources - 2020*. PDF 14-15.

## CONCLUSION

The government has not met its burden to substantiate the invocation of GLOMAR for request 1558747-000. The government has a clear obligation to produce the responsive records to the defendants in *Netyksho*, Dagon and Antonakakis have waived their privacy interests, documents are already known to exist, and the public's interest is immense in evaluating the government's decision to rely on them in the DNC hack investigation. The government must lift the veil of secrecy and conduct a search for responsive records.

It's a closer call for request 1561520-000. The FBI was more concerned about pursuing an investigation into Donald Trump than taking the time to evaluate Christopher Steele's dossier or Igor Danchenko's role in it. Danchenko was improperly opened as a CHS and for improper purposes that were not in furtherance of law enforcement activities. The FBI didn't need Danchenko to relay drunken conversations from bar talk. The public deserves to see the responsive documents that are sure to raise more questions about this relationship. This was already demonstrated when the Senate Judiciary Committee released one interview transcript which revealed numerous lies had been told by the government including that Danchenko was based in Russia, when in fact, he was in Washington DC. The FBI should produce the responsive records in the fullest measure possible, with appropriate redactions for sensitive and ongoing matters.

Respectfully submitted,

Dated: February 29, 2024

Ryan Milliron, Pro Se
PO Box 516
211 W Exchange St
Spring Lake, MI 49456